CITY OF FORT SMITH *v.* HAIRSTON.

4-5200                                     120 S. W. 2d 689.

Opinion delivered October 24, 1938.

*Fadjo Cravens,* for appellants.

*Roy Gean,* for appellee.

BAKER, J. The city of Fort Smith has a commission form of government, organized under the provisions of act 13 of the Acts of 1913. Section 11 of said act, if valid, imposes an obligation upon the commissioners, as representatives of the city, to make certain allowances for police officers or firemen when such officers or fire-

men shall have been killed in the actual performance of official duties. Said § 11 contains the following: "Whenever a police officer or a fireman of the city shall be killed in the actual performance of his official duties, the board shall cause to be set aside for the use and benefit of his wife and children, or others necessarily dependent upon him for their support, if any such others survive him, the sum of one thousand dollars, which shall be paid in installments as shall be required, and in the judgment of the board shall be deemed advisable."

Mrs. Hairston, who will be referred to by name, or as plaintiff or appellee, filed a claim with the board of commissioners for one thousand dollars, alleging the death of Mr. Hairston, who was a police officer, and who was alleged to have been killed while in the actual performance of his duties. The appellant, having heard the evidence, considered the claim and denied it. All matters were then brought before the Sebastian circuit court for the Fort Smith district on certiorari. Upon trial that court reversed the findings and order of the board of commissioners and directed that one thousand dollars be set aside for distribution under the provision of aforesaid act. From this judgment of the circuit court comes this appeal.

There is no substantial dispute in regard to the evidence, and for that reason the facts will be stated as our conclusions of the material part of the evidence without attempting to quote in detail therefrom.

Mr. Hairston was employed by the police department of the city of Fort Smith until his death on September 27, 1936. On that date in the performance of his duties he was called to some kind of a disturbance at a certain point in the city. When he had reached the place of disturbance he was approached by a negro who had a gun in his hand. Mr. Hairston was sitting in a car used by him in going to the place of disturbance, at the time the negro approached. He called to the negro to drop the gun, but the negro refused to do so. He was then shot and killed by Hairston. Immediately following this incident Mr. Hairston left the car, and went to a nearby ice plant to call an ambulance to pick up the negro. He

then returned from this duty to the scene of the killing where he immediately fell dead. All of this took place within a short time, possibly not exceeding ten minutes. Because of undisputed facts, we take a statement of the chief of police to the effect that Hairston was not in any manner shot or hurt, and did not suffer any personal violence, but died from heart failure after the shooting and making the telephone call.

A physician who had been treating Mr. Hairston for two or three years on account of his heart affliction told of seeing Mr. Hairston almost every week for observation and advice for a year or two, and stated that Mr. Hairston had a leaky and enlarged heart, and then made this statement as opinion evidence. That if Mr. Hairston was engaged in a shooting affray, and died about ten minutes after the shooting, based on his knowledge of Mr. Hairston's condition, he would say that the cause of his death was fright. In addition, he stated that he had advised Hairston against going upstairs, walking fast, cranking cars or any such exercise, advising him that any of these things might cause immediate death. He thought Hairston's death was caused by fright, because fright is really worse than exercise, then he added ''at any rate anything to accelerate the heart beat would be dangerous.''

Two propositions are submitted to us for consideration upon this appeal. The first to be determined is whether Hairston was killed within the meaning of act 13 of the Acts of 1913. The second is the validity of said § 11, making provisions for dependents of firemen or police officers when killed in the actual performance of official duties.

Our first impulse upon reading the provision of § 11 of aforesaid act was to declare that its terms were so plain and unmistakable as to not admit of any construction or any interpretation. However, appellee's expertly prepared brief, together with the authorities cited and the use made of them, have created a doubt which must be disposed of in a proper determination of that issue.

In the settlement of this question, we invoke that time honored canon of construction employed not only by lawyers and courts, but most frequently by laymen, although they may not be able to state the wholesome rule. Words and phrases shall be given their ordinary or generally accepted meaning, unless there is something in the context to indicate that another or different meaning was intended. The active verb ''to kill'', or the passive verb ''to be killed'' must generally impart to everyone a meaning of some kind of external violence. This does not imply that the agency inflicting the violence must be animate, or if animate that death was intended by the act causing it.

Because we were impressed by the illustrations employed in the briefs presented on this case we have elected to use the same method of illustration to some extent as indicative of our meaning rather than attempt to present the idea by abstract generalities. We do this, because we think said § 11 of the aforesaid act, as it is drawn justifies this process of reaching a proper conclusion.

No one would doubt that, if a fireman upon running to a fire were thrown from a truck, or if he came in contact with a high tension wire, or if a wall or roof engulfed him and destroyed him, his dependents might invoke this statute for relief. Nor would any one doubt that if the negro who approached the car where Hairston sat had shot Hairston instead of being killed himself, or if Hairston had been destroyed by some misadventure as he went to the scene or while there, no doubt would ordinarily have arisen about the propriety of relief under the statute. It must, therefore, be apparent, we think, that the object and purpose of this statute was to provide a form of relief for the dependents of police officers or firemen whose death was brought about by some hazard of their employment. If this question may not be so treated, and so determined, then perhaps it must be regarded as a kind of life insurance payable upon the death of such fireman or police officer when such death occurs during the time of their employment.

We think the fact that this was not the intention of the lawmaking body is evidenced by the choice of language used in § 11 aforesaid in the apparent effort to confine and determine liability under certain, fixed conditions, any of which conditions being absent the idea of compensation or liability is excluded. We think the very language used as setting out the conditions under which the board may act in providing for the dependents of the unfortunate police officer or fireman is the best example we know of an accurate expression intended to leave no doubt as to its meaning.

Having this view we will consider the language quoted below in the light of the testimony of the deceased's physician: "whenever a police officer or fireman of the city of Fort Smith shall be killed in the actual performance of his official duties . . . ." Before taking up the testimony of the physician we call attention again to the expression used that such firemen or police officers must be engaged in the actual performance of official duty.

It is conceivable, therefore, that a fireman might be sleeping in the fire station at night, because required to be ready for any emergency, and to that extent on duty, and be killed by an explosion, or an accidental shot from a distant gun, or the bite of a poisonous insect or reptile, and yet his widow or other dependent not be entitled to an award of the $1,000. Such hazards are common to all men everywhere. They are not peculiar to firemen. To be "killed in actual performance of official duties" imports action not a mere state of being.

We think a part of the physician's statement set forth in the brief has been over emphasized. We are ready to believe what the doctor states—that fright is perhaps one of the most dangerous conditions that might destroy one suffering as this police officer was; but we submit that the conclusions are most highly conjectural. There is not a particle of evidence that this police officer suffered from fright in the least; and we think the experience of most men must be such that it would be hard to believe, under the circumstances, that this officer was frightened to death. One does not have to possess

the romantic idea or belief in proverbial courage of policemen to reach this conclusion.

By this announcement we do not intend to impair, in the least, that portion of the doctor's statement at the conclusion of his examination in chief, which is as follows: "at any rate, anything to accelerate the heart beat would be dangerous."

As we view the picture presented by the evidence there was a tense situation. Trouble had arisen causing some one to call the police officer. Immediately upon the. arrival of the officer at the place of disturbance a negro approached with a gun in his hand. He refused to drop the gun when ordered to do so. If he had not intended to shoot, he most probably would have made some explanation or obeyed the officer's command. Necessarily, there was excitement. This was perhaps increased by the impelling desire to save himself from an attack of his assailant rather than be killed by him. It is easy to believe that immediately following this shooting when the officer went to the ice plant to call for the ambulance he moved with greater speed than his condition justified. In all this he was not the victim of any violent contact, no outward force took his life. He died, because his weakened heart could not stand the excessive strain he himself put upon it.

Our conclusion is that Mr. Hairston was not killed, but that he died of heart trouble. Even the doctor on cross-examination says that the condition he was in was such his death might have been brought about at any time by lifting, walking up stairs, exercising; that heart failure might be the result of any of these things.

We have been cited to the case of *Buckley* v. *Roche,* 214 Cal. 241, 4 P. 2d 929, as authority to support the circuit court judgment. We do not reach this conclusion. The provisions and purposes of the relief granted in the California case are quite different from our statute. Under the charter of the city of San Francisco, pension was claimed by the widow of one so injured while performing duties that he died. The claim was not granted by reason of the fact that the officer was killed in such performance of duties, though there was a provision for

the pension under such a condition. The relief was granted on the theory of injury suffered so that he died, and not because he was killed. The charter so differs from our statutes we think the case not applicable or persuasive, but rather serves to aid us in the distinction we make.

There is perhaps little necessity to decide the other question relied upon in this appeal. The appellant suggests and argues in his brief that § 11 of the aforesaid act is in contravention of § 5, art. 12 of our constitution. "No county, city, town or other municipal corporation shall become a stockholder in any company, association or corporation; or obtain or appropriate money for, or loan its credit to any corporation, association, institution or individual." The authorities cited and relied upon are decisions from the courts of Missouri and Massachusetts, and we would be in hearty accord with these decisions, except for the fact that we regard the alleged bounty as provided for under § 11 aforesaid as being in the nature of compensation earned by such firemen or police officer as may be killed while in the actual performance of official duties. If it were intended to be a gift or donation, to those who are dependent, by reason of the loss of the sustaining husband or parent, the language in the foregoing provision would have so indicated, and the interpretation now sought by appellee would have necessarily followed.

Without deciding, we suggest the general welfare provisions of the statutes confer such powers on municipal corporations to justify legislation under consideration. *Bourland* v. *Pollock,* 157 Ark. 538, 249 S. W. 360; *Shofner* v. *Dowell,* 168 Ark. 229, 269 S. W. 588, 987.

If we may state our conclusions in other language, we think appellant's contention might have been more clearly justified had the act provided for the payment of one thousand dollars to the dependents of a police officer or fireman who died in service. Clearly such a provision would have indicated a gratuity or pension; not compensation earned by the officer. There is a wide difference in paying over money, because earned and in distributing a gratuity or donation fund. The com-

pensation concept makes for a more satisfactory public service—a more efficient discharge of official duties. The donation or gratuity idea is under the ban of the constitutional mandate.

For the error indicated the judgment is reversed, and the cause is dismissed.