The Honorable Jeremy Hutchinson State Representative 14220 Chesnay Court Little Rock, AR 72211-6112
Dear Representative Hutchinson:
I am writing in response to your request for my opinion on the following questions:
 1. If enacted, would the attached House Bill 1083 violate the school funding formula?
 2. If enacted, would the attached House Bill 1083 violate any other current state educational laws?
RESPONSE
In Lake View School District No. 25 v. Huckabee, Arkansas Supreme Court Case No. 01-836 (Nov. 21, 2002), the supreme court recently declared that the existing school funding formula violates the constitutional guarantee of a "general, suitable and efficient education." Ark. Const. art. 14. All other things being equal, H.B. 1083 would clearly increase disparities in per-pupil expenditures among the various school districts, thereby exacerbating the formula's unconstitutional effect. In the wake of Lake View, the legislature is charged with significantly modifying Arkansas' school-funding system. I obviously cannot opine on what effect your H.B. 1083 might have under any funding formula to be adopted in the future. With respect to your second question, I am unaware that H.B. 1083 conflicts with any current state statute. Even if there were a conflict, the proposed statute would repeal by implication any conflicting previous legislation. As for additional constitutional issues, assuming H.B. 1083 were reviewed under the rational basis standard, it might well be upheld as serving a public purpose and not offending the guarantees of due process and equal protection. Alternatively, if the effect of the proposed legislation were to increase disparities in per-pupil expenditures and a court were to review the proposed legislation under the stringent strict-scrutiny standard applicable to state action affecting a fundamental right, I believe the proposed legislation might well be stricken as not narrowly tailored to serve a compelling state interest. Although the supreme court in LakeView declined to reach the issue of whether education is a fundamental right, it did declare that the state has "an absolute constitutional duty to educate our children" — a coinage suggesting that judicial analysis of your proposed legislation might be more stringent than a mere rational-basis review. I am unable to opine precisely what standard of review would apply, much less to apply that standard to a factual situation currently in a state of extreme flux. Finally, I do not believe your proposed legislation constitutes "special" legislation of the sort prohibited by Ark. Const. art. 14.
Question 1: If enacted, would the attached House Bill 1083 violate theschool funding formula?
The school funding formula, as well as the other state laws referenced in your request, are subject to various constitutional mandates, including the following:
1. Free school system.
 Intelligence and virtue being the safeguards of liberty and the bulwark of a free and good government, the State shall ever maintain a general, suitable and efficient system of free public schools and shall adopt all suitable means to secure to the people the advantages and opportunities of education. . . .
2. School fund — Use — Purposes
 No money or property belonging to the public school fund, or to this State for the benefit of schools or universities, shall ever be used for any other than the respective purposes to which it belongs.
Ark. Const. art. 14. Section 3 of article 14, as amended by Ark. Const. amend. 74, establishes a 25-mill uniform ad valorem property tax "to be used solely for maintenance and operation of the schools." Ark. Const. amend. 74(b)(1). Amendment 74 expressly empowers individual school districts, with voter approval, to levy additional property taxes for the same purpose. Id. at § (c)(1). Amendment 74 was implemented by legislation set forth at A.C.A. § 26-80-101 et seq., which codified the constitutional mandate regarding the uniform rate of taxation. School funding is further addressed in the Equitable School Finance System Act of 1995, codified at A.C.A. § 6-20-301 et seq. In addition, A.C.A. §6-17-1001 sets forth minimum salaries for public school teachers based on experience and training.
H.B. 1083 would add to the Code a new statute, A.C.A. § 26-51-511, providing an income tax "credit" for teachers. Specifically, the bill provides that "teachers," as defined, will receive a $1,200 credit against Arkansas income tax in tax year 2003 and a $3,600 credit for each tax year thereafter. The bill further provides: "If the tax liability is less than the credit, the excess of the credit over the tax liability shall be returned to the taxpayer as an overpayment."
Given basic principles of statutory interpretation, I believe there is a certain confusion in your suggestion that the bill, if enacted, might "violate" the school funding formula. Implicit in the term "violate" is a suggestion that enacting your proposed legislation might amount to an infraction of current statutes. However, ordinarily, the provisions of an act adopted later in time repeal the conflicting provisions of an earlier act. Daniels v. City of Fort Smith, 268 Ark. 157, 594 S.W.2d 238 (1980). If enacted, then, H.B. 1083 would simply supersede any prior conflicting legislation.
Nevertheless, the proposed legislation must comply with constitutional mandates, since the constitution embodies supreme state law that cannot be contravened by statute. As you know, in Lake View School District No.25 v. Huckabee, Arkansas Supreme Court Case No. 01-836 (Nov. 21, 2002), the supreme court recently declared the school funding system unconstitutional. Given this ruling, I obviously cannot opine whether your proposed legislation would "violate" an already unconstitutional school funding formula. However, I can and will comment on what might be the effect of H.B. 1083 on a funding formula that passes constitutional muster. For purposes of my discussion, I will assume that both the issuance of tax credits and the "repayment" of taxes that were never initially paid constitute an expenditure of public funds to advance education.[1]
Given that it would afford all teachers the same tax credit, at first blush H.B. 1083 might appear neutral with respect to the school funding formula. However, because school districts currently have, and presumably will continue to have, varying ratios of students to teachers, an across-the-board tax benefit for teachers will necessarily increase the disparity in per-pupil expenditures among the various districts. InDupree v. Alma School District No 30, 279 Ark. 340, 344, 651 S.W.2d 90
(1983), the supreme court affirmed a chancellor's judgment declaring the state's school financing system unconstitutional, noting that "there are sharp disparities among school districts in the expenditures per pupil and the education opportunities available as reflected by staff, class size, curriculum, remedial services, facilities, materials and equipment." As a matter of basic mathematics, infusing a fixed amount of money into a district with a low student-to-teacher ratio will increase the expenditure per student more than will infusing the same amount into a district having a high student-to-teacher ratio. Although this aggravation of disparities appears inevitable under the current system, I am neither equipped nor authorized to address the factual question of whether granting an across-the-board raise to teachers would result in unconstitutional disparities under any revised school funding formula adopted in the wake of the Lake View decision. For that matter, I am further not equipped to opine whether under some future formula certain disparities might not actually be warranted to accommodate disparate financial needs among the districts. I will note, however, that in its across-the-board application H.B. 1083 does not appear designed to address any such disparate needs. I can only opine that so long as disparities of the sort discussed above continue to exist, it is at least possible that enacting your proposed legislation would "violate" the education clause of Ark. Const. art. 14 — the constitutional directive that the school funding formula was designed to enforce.
Question 2: If enacted, would House Bill 1083 violate any other currentstate educational laws?
Again, the term "violate" in this question is meaningful only with respect to constitutional mandates. I will discuss below various other constitutional provisions that might be implicated by your proposed legislation.
As a general proposition, in order to pass constitutional muster, any use of public funds must serve a "public purpose." See generally Chandler v.Board of Trustees of the Teacher Retirement System of the State ofArkansas, 236 Ark. 256, 356 S.W.2d 497 (1963); Ark. Ops. Att'y Gen. Nos.92-188 and 91-410. In Chandler, the Court unequivocally declared that any diversion of public funds to a private purpose would offend the Arkansas Constitution's due process clause, Ark. Const. art. 2, § 8.236 Ark. at 258. In the present case, even though the tax credits and reimbursements would directly benefit the individual recipients, I believe these benefits are designed to, and in fact would, redound to the public good insofar as they would encourage teacher recruitment and retention. Accordingly, I do not believe the enactment of your proposed legislation would violate the public-purpose doctrine.
The proposed legislation might further be questioned as violating the equal protection guarantees set forth in U.S. Const. amend. 14 and Ark. Const. art. 2, §§ 2 and 3. In Ark. Op. Att'y Gen. 99-446, my predecessor set forth the elements of an equal protection challenge as follows:
 The equal protection doctrine prohibits certain types of "classifications" that result in the disparate treatment of those who are similarly situated. However, classifications in and of themselves do not violate the equal protection doctrine. In order to establish an equal protection violation arising out of a classification that does not affect a suspect class or a fundamental right, it is necessary to show that the disparity is arbitrary — that is, that the disparity has no conceivable rational basis or rational relation to a legitimate end. Vacco v. Quill, 521 U.S. 793 (1997); Romer v. Evans, 517 U.S. 620, 631 (1996); Clements v. Fashing, 457 U.S. 957 (1982); Craft v. City of Fort Smith, 335 Ark. 417, 984 S.W.2d 22 (1998); Medlock v. Leathers, 311 Ark. 175, 842 S.W.2d 428 (1992), reh. denied, 1993; McCambridge v. City of Little Rock, 298 Ark. 219, 766 S.W.2d 909
(1989); Streight v. Ragland, 280 Ark. 206, 655 S.W.2d 459 (1983); City of Piggott v. Woodard, 261 Ark. 406, 549 S.W.2d 278 (1977).
 In reviewing the constitutionality of a classification that does not affect a suspect class or a fundamental right, the courts must not only presume the constitutionality of the challenged classification, but they must also uphold the classification even without requiring a showing of an actual rational basis, so long as any conceivable rational basis for the scheme can be adduced — even a hypothetical one. Ester v. National Home Ctrs., Inc., 335 Ark. 356, 981 S.W.2d 91(1998); Reed v. Glover, 319 Ark. 16, 889 S.W.2d 729 (1994); Arkansas Hospital Assoc. v. State Board of Pharmacy, 297 Ark. 454, 763 S.W.2d 73
(1989).
The Arkansas Supreme Court has not yet directly addressed whether education implicates a fundamental right that would trigger the more rigorous "strict scrutiny" standard of review, under which challenged legislation will be upheld only if it is narrowly tailored to serve a compelling state interest. U.S. Term Limits, Inc. v. Hill, 316 Ark. 251,271, 872 S.W.2d 349 (1994). However, in Lake View, although it suggested that "perhaps the recalcitrance of the State to reform the school-funding system is reason enough to adopt the heightened standard of strict scrutiny," Slip Opinion at 57, the court also bluntly declared that "[s]trict-scrutiny review is unwarranted in this case" because "[w]e have never considered school districts to be a suspect class for purposes of an equal-protection analysis," id. at 45. The court offered the following remarks regarding the appropriate standard of review:
 Nevertheless, because we conclude that the clear language of Article 14 imposes upon the State an absolute constitutional duty to educate our children, we conclude that it is unnecessary to reach the issue of whether a fundamental right is also implied. Many states . . . appear to get lost in a morass of legal analysis when discussing the issue of fundamental right and the level of judicial scrutiny. This court is convinced that much of the debate over whether education is a fundamental right is unnecessary. The critical point is that the State has an absolute duty under our constitution to provide an adequate education to each school child. Like the Vermont and Arizona Supreme Courts, we are persuaded that that duty on the part of the State is the essential focal point of our Education Article and that performance of that duty is an absolute constitutional requirement. See Brigham v. State, [692 A.2d 384 (1997)], supra; Roosevelt Elementary Sch. Dist. No. 66 v. Bishop, [877 P.2d 806 (1994)], supra. When the State fails in that duty, which we hold today is the case, our entire system of public education is placed in legal jeopardy. Should the State continue to fail in the performance of its duty, judicial scrutiny in subsequent litigation will, no doubt, be as exact as it has been in the case before us.
Slip Opinion at 36. This focus on the state's "absolute duty" to ensure an adequate and equitable education suggests that the intensity of review applied to education laws might be stricter than that conducted under the rational-basis standard. The court in Lake View did, however "admit to some apprehension about using a strict scrutiny standard, because it has never been this court's constitutional function to micromanage the public schools of this state or even to retain jurisdiction over the public school system until, in our judgment, an adequacy standard has been achieved." Id. In the absence of further guidance, I can do little more than suggest how your proposed legislation might fare under both rational-basis and strict-scrutiny analyses in the face of an equal protection challenge, recognizing that a court might apply a standard whose stringency falls somewhere between the two.
In my opinion, the proposed legislation creates at least three sets of classifications that might give rise to an equal protection challenge. The first involves the variously benefited groups of students in the districts having divergent student/teacher ratios. The question in such a challenge might be whether the legislature could have had any conceivable rational basis for enacting a uniform tax credit/pay raise for teachers that had the unintended effect of exacerbating existing disparities in expenditures per student among districts. I believe a challenge based on this reasoning would probably fail. The obvious purposes of the proposed legislation are to motivate teachers and to encourage their recruitment and retention — highly laudable and rational goals. I do not believe the uniform tax credit would be deemed a violation of equal protection under the rational-basis standard simply because of an indirect and minor effect on students. By contrast, I doubt the proposed legislation could withstand a strict-scrutiny analysis. Although the court in Lake View
sharply criticized the low pay of Arkansas teachers, Slip Opinion at 24-25, 43, suggesting that it might characterize remedying this problem as a compelling state interest, given that granting teachers an across-the-board pay increase would aggravate existing disparities in per-pupil expenditures, a reviewing court would in all likelihood not deem this remedy sufficiently narrowly tailored to achieve the desired end.
In limiting the tax credit to teachers, the proposed legislation further creates a distinction between teachers and all other taxpayers. Again, I think enacting this classification would easily withstand an equal protection challenge under the rational-basis standard, since motivating and adequately compensating teachers is eminently rational. No principle of law or logic dictates that a narrowly tailored tax credit designed to advance education must be extended to the public in general.[2] Since students are not one of the groups in this particular analysis, I do not think either a strict-scrutiny or some intermediate analysis could apply.
The proposed legislation might also be challenged as impermissibly distinguishing between those public-school teachers who would receive the credit and those who would not, such as public university professors. I believe that this challenge would be reviewed under a rational-basis standard and that the legislation would easily pass that test. The legislature may simply have determined that public-school teachers in particular were overdue for a raise or, alternatively, that the state could not afford at once raising the pay of all teachers at all levels. Making such a distinction would not be facially irrational and would consequently be upheld.
Your proposed legislation might conceivably further be challenged as "special" legislation in violation of Ark. Const. amend. 14. As noted inBoard of Trustees v. City of Little Rock, 295 Ark. 585, 589,750 S.W.2d 950 (1988): "An act is special if by some inherent limitation it arbitrarily separates some person, place, or thing from those upon which, but for such separation, it would operate." The operative term in this formulation is the word "arbitrarily," which implies that the legislative separation of one individual or group is permissible if justifiable. In McCutchen v. Huckabee, 328 Ark. 202, 208, 945 S.W.2d 225
(1997), the supreme court declared that the test for determining whether legislation is "special" is the same "rational basis" test applied in an equal protection analysis. Consequently, in my opinion, your proposed legislation would likely withstand an Amendment 14 challenge for the reasons set forth in my equal protection discussion.
Finally, I feel compelled to address the fact that the "repayment" proposed in H.B. 1083 is a misnomer, since the recipient will never have tendered payment in the first place. However, although there may be something intellectually discordant in characterizing a pay increase as a "repayment" of taxes — or, for that matter, as a "tax credit" — I am unaware of any constitutional proscription against doing so. Moreover, as reflected in the following analysis by one of my predecessors, it is generally accepted that legislative and ordinary language need not necessarily align, affording legislators considerable room for semantic creativity:
 Although there appears to be at least some difference of opinion, it is ordinarily held that where a specific definition is given a term in a legislative format, that definition will control even though it does not coincide with the ordinary meaning of the term. Packard Motor Co. v. National Labor Relations Board, 330 U.S. 485 (1946); Consumer's Union of United States, Inc. v. Heimann, 589 F.2d 531 (D.C. Cir. 1978); Louisiana Chemical Ass'n v. Bingham, 496 F.Supp. 1188 (D.C. La. 1980).
 This principle has been embraced by the Arkansas Supreme Court as evidenced by the following language from Bird v. Pan Western Corp., 261 Ark. 56, 546 S.W.2d 417 (1977):
 The ordinary and generally accepted meaning of words used in a statute must yield to the meaning intended by the General Assembly when it is clear from the context of the act that a different meaning is intended. City of Fort Smith v. Hairston, 196 Ark. 1005, 120 S.W.2d 689. Thus, in construing an act, the courts are bound by specific definitions of a word by the legislature in that act, regardless of the usual and ordinary meaning of that word; unless the definition is arbitrary, creates obvious incongruities in the statute, defeats a major purpose of the legislation or is so discordant to common usage as to generate confusion. 1A Sutherland, Statutory Construction (4th
Ed.) pp. 59, 310, 81; 20.09, 27.02, 47.07.
261 Ark. at 60.
Ark. Op. Att'y Gen. No. 89-004 (footnote omitted).[3] In the present case, it is perfectly clear what your proposed legislation is designed to do. Accordingly, I do not believe the bill could be successfully challenged simply because the purported "repayment" is in fact a grant.
To summarize, in my opinion, your bill if enacted would definitely have an influence on the existing school-funding formula insofar as it would increase already unconstitutional disparities in per-pupil expenditures among the various districts. I am unable to opine what effect it would have upon any future school-funding formula. Assuming the rational-basis standard applies, I do not believe the proposed statute could be successfully assailed as not serving a public purpose or violating either the due process or the equal protection clause. By contrast, I do not believe the proposed statute could withstand a strict-scrutiny analysis. I further do not believe the proposed statute could be successfully challenged as constituting special legislation or on the bases that certain terminology used therein may not comport with the ordinary meaning of the terms used.
Assistant Attorney General Jack Druff prepared the foregoing, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
MB:JD/cyh
[1] In Lake View, the court ruled that "expenditures spent on the students," as opposed to "revenues paid to the school districts," constitute the appropriate measure of equality under the school-funding formula. Slip Opinion at 38. The fictional "repayment" to teachers of taxes never collected clearly qualifies as an expenditure of public funds on education. Although classifying a tax credit as an expenditure is somewhat more problematic, given that the credited taxes were never collected and made available for public use, in this instance the credit would amount to a state-tax-exempt pay raise. Although I cannot formally opine on the issue, the IRS might treat both the credit and the "repayment" as income.
[2] The situation in this case is in some respects analogous to that addressed in Pledger v. Bosnick, 306 Ark. 45, 811 S.W.2d 286 (1991), in which the Arkansas Supreme Court, relying on Davis v. Michigan Departmentof Treasury, 489 U.S. 803 (1989), affirmed a chancellor's ruling that the state could not fully exempt certain state retirees from taxation while only partially exempting retired federal workers. The Court based its conclusions exclusively on "the principles of intergovernmental tax immunity" codified at 4 U.S.C. 111, id. at 49, which prohibit such intergovernmental discrimination. By contrast, in Melof v. James,735 So.2d 1172 (Ala. 1999), the Alabama Supreme Court, after acknowledging the holding in Davis, unaccountably ignored the principle of intergovernmental tax immunity and addressed a materially indistinguishable tax exemption for certain state retirees by conducting a standard equal protection analysis. The court upheld the legislation, adopting the lower appellate court's conclusion that the challenged legislation served the rational end of attracting and retaining qualified public servants. Id. at 1181, citing Melof v. James, 735 So.2d 1166, 1169
(Ala.Civ.App. 1998).
[3] In his opinion, my predecessor concluded that the legislature was justified in categorizing "beer" as "food."