### BOURLAND *v.* POLLOCK.

### Opinion delivered March 19, 1923.

1. MUNICIPAL CORPORATIONS—GENERAL WELFARE CLAUSE—CONTRIBUTION TO CHARITY.—Under the general welfare clause of Crawford & Moses' Dig., § 7494, conferring on municipal corporations power to make ordinances necessary to provide for the safety, preserve the health, promote the prosperity and improve the morals, order, comfort and convenience of such corporations and the inhabitants thereof, a city was authorized to contribute money to a welfare association organized "to cause afflicted and diseased children to receive medical attention, to maintain a maternity ward for expectant mothers unable to have sanitary and proper surroundings for their ordeal, to care for babies whose parents are unable to care for them, to furnish food and clothing for those unable to buy the same, and free soup for families unable to buy nourishing food, and to provide moral surroundings for girls without homes."

2. MUNICIPAL CORPORATIONS—CHARITABLE CONTRIBUTIONS.—Const. art. 12, § 5, providing that no municipality shall appropriate money for or loan its credit to any corporation, association, institution or individual, *held* not to prohibit a municipal corporation from making appropriations to a welfare association or committee organized to render aid to the poor and unfortunate of the city.

3. MUNICIPAL CORPORATIONS—CHARITABLE CONTRIBUTIONS.—The fact that the general statutes provide ways and means of doing the work which a welfare association organized to help the poor and unfortunate of the city was doing did not make a municipal ordinance appropriating money for the support of such association invalid.

Appeal from Sebastian Chancery Court, Fort Smith District; *J. V. Bourland,* Chancellor; affirmed.

*Fadjo Cravens,* for appellant.

Appellant contends that the ordinance of the city of Fort Smith appropriating or donating money to the welfare association is void, being in conflict with the Constitution. Sec. 5, art. 12, Constitution. The statutes make ample provision for caring for the unfortunate, the needy, the sick and afflicted. Sec. 2, act 629, Acts of 1919. Sec. 8159, Crawford & Moses' Digest.

*Hill & Fitzhugh,* for appellee.

The ordinance is not in conflict with the Constitution, nor invalid, and the decree should be affirmed. Provisions of articles of the Constitution of 1874 reviewed and construed in connection with and in the light of the history of the times, secs. 4, 5, 7 and 12 of art. 12; sec. 1, art. 11; secs. 8, 9 and 11 of art. 16; sec. 27, art. 19. The general rule is that no taxation can be levied for other than public purposes, and the objects of their association to relieve the unfortunate and improve the health and morals of the community stamp it a public purpose, for promotion of which taxation money can be expended. Cooley on Taxation, 204-5; *Cumnock* v. *Little Rock,* 10 L. R. 519; *Jonesboro* v. *Montague,* 143 Ark. 13; *Shepherd's Fold of the Protestant Church* v. *Mayor, Aldermen and Commonalty of City of New York,* 96 N. Y. 137. An analogous question presented in *Brizzolara* v. *State,* 37 Ark. 364. See also *DeWitt* v. *Lacotts,* 76 Ark. 250. *Brooks* v. *State,* 86 Ark. 364. The city is not divested of authority to do welfare work because the county or other public agencies are also engaged in it. A juvenile court has been created for another branch of the work. Secs. 5752-3, Crawford & Moses' Digest.

WOOD, J. The Fort Smith Federated Welfare Association (hereafter called welfare association) is a voluntary unincorporated organization, assembly, or committee, composed of the mayor of the city of Fort Smith, commissioner No. 1 of Fort Smith (the commis-

sioner in charge of public health and safety), the county judge of Sebastian County, the pauper commissioner of the Fort Smith District of Sebastian County, the juvenile officer of the Fort Smith District of Sebastian County, and representatives of various civic and social clubs, organizations and associations in the city of Fort Smith, which have as one of their objects the promotion of benevolences in that city.

The purposes of the "welfare association" are as follows: "To cause afflicted and diseased children to receive medical attention, to maintain a maternity ward for expectant mothers unable to have sanitary and proper surroundings for their ordeal, to care for babies whose parents are unable to care for them, to furnish food and clothing for those unable to buy the same, and free soup for families unable to buy nourishing food, and to provide moral surroundings for girls without homes."

There is held annually in the city of Fort Smith a mass meeting, pursuant to notice, of people interested in the sick and afflicted of the town. At that meeting two members are elected and representatives are chosen from the various civic and social clubs, associations and organizations above mentioned, and these, with the mayor and commissioner No. 1 of the city of Fort Smith and the county judge of Sebastian County, the pauper commissioner of the Fort Smith District of Sebastian County, and the juvenile officer of the Fort Smith District, constitute the "welfare association" or committee for the ensuing year. One of the members of the welfare association is designated as the president and another is designated as treasurer thereof. The members thus chosen are designated the "welfare association," but it is not in reality an association, institution, or corporation, but a mere committee of officers and charitably disposed citizens who undertake to effectuate the purposes of the welfare association as above set

forth. The committee maintains a day nursery to care for babies who have no mothers, or whose mothers are unable to care for them; maintains a maternity ward, and has established a free clinic. The medical association appoints members to serve weekly at such clinic without compensation, and there are brought to the clinic, through visiting committees consisting of men and women appointed by the welfare association, afflicted children for examination and treatment, for various dental work, vaccination, etc. The welfare association maintains a building to which matrons at depots and other persons carry homeless girls and place them there, under moral surroundings and restraints calculated to deter them from waywardness and immorality. The welfare association furnishes food and raiment to the indigent of the city who are in need thereof.

This action was brought by the appellants as the board of commissioners of the city of Fort Smith against the appellee in his individual capacity and as treasurer of the welfare association. The complaint alleges that the appellee, as treasurer of the welfare association, receives and disposes of all funds thereof; that the board of commissioners of the city of Fort Smith passed an ordinance appropriating to the welfare association the sum of $125 per month; that the city clerk, acting under the authority of the above ordinance, drew a check upon the general funds of the city for the month of November, 1922, in the sum of $125; that the ordinance appropriating the money for the purposes indicated is unconstitutional and void; that the check is negotiable and an outstanding evidence of indebtedness against the general funds of the city of Fort Smith. They allege that the appellee, unless restrained, will cash the check and thereby deprive the city of Fort Smith of the funds to which it is legally entitled; that the city has no sufficient or adequate remedy at law to prevent the collection of such funds by the appellee, and they therefore pray that he be enjoined from cashing the check and be

directed to return the same to the proper authorities of the city.

The treasurer of the appellee answered, setting up the organization and purposes of the welfare association as above set forth, admitting that he held the check as alleged in the complaint, and alleged that he was entitled to have the same paid out of the general funds of the city, and, unless restrained and enjoined, he will proceed to collect and expend the same under the auspices of the welfare association. He denied that the ordinance of the city, under the authority of which the check was drawn, is unconstitutional and void. He alleged that the appropriation of the money for the purposes indicated was not a loaning of the credit of the city to any corporation, association, institution, or individual, but the money was appropriated and about to be expended in the preservation of the health and to promote the prosperity and improve the morals, comfort and convenience of the inhabitants of the city in behalf of the sick and afflicted children, and the other benevolent and charitable purposes for which the welfare association, as above indicated, was constituted. The answer then sets up the manner in which the welfare association was constituted and its purposes, as already stated, and specifically enumerates the various charities it has conserved, in accordance with the purposes of the welfare association, and specifically states the amount of funds it had paid out for such charities.

There was a demurrer to the answer. The court heard the cause upon the complaint, the answer thereto, and the demurrer, and the testimony of one D. C. Green, who was the president of the welfare association. The testimony of Green shows that the work of the welfare association was materially aiding the health of the children of the city, especially through the free clinic and the nourishing food given those otherwise unable to receive the same; that it had improved the morals of the town in giving care and attention to wayward girls, and had re-

lieved much suffering among people unable to care for themselves and who were not sufficiently fed and clothed.

The court overruled the demurrer to the answer and entered a decree dismissing the complaint for want of equity. From that decree is this appeal.

Section 5, article 12, of the Constitution of 1874 is as follows: "No county, city, town, or other municipal cor poration shall become a stockholder in any company, association or corporation, or obtain or appropriate money for or loan its credit to any corporation, association, institution or individual." The question for decision is whether or not the ordinance appropriating money to the Fort Smith Federated Welfare Association, as set up in the pleadings, is contrary to the above provision of the Constitution. The complaint alleges that the welfare association is "a benevolent organization organized for the purpose of rendering aid to the poor and unfortunate of the city" (Fort Smith). The answer alleged, and the demurrer admits, and the proof shows, that the welfare association "is not an association, institution, or corporation, but it is a mere committee of officers and charitably disposed citizens who undertake to carry on the work above mentioned in behalf of the sick and afflicted children, wayward girls, and worthy or indigent families who are undernourished and poorly clothed and fed."

It will be observed therefore that the so-called "welfare association" does not in fact come within the inhibitory words of the Constitution. It is not a "corporation, association, institution, or individual," but a committee formed in the manner alleged in the answer and shown by the proof, to effectuate the benevolent and moral purposes designated, all for the preservation of the health, the promotion of the prosperity, and the improvement of the morals of the inhabitants of the city of Fort Smith. The commendable objects for which this committee was organized come well within the general welfare clause of our statute which confers upon muni-

cipal corporations "power to make and publish such by-laws and ordinances, not inconsistent with the laws of this State, as to them shall seem necessary to provide for the safety, preserve the health, promote the prosperity and improve the morals, order, comfort and convenience of such corporation and the inhabitants thereof." Sec. 7494, C. & M. Digest. Judge COOLEY says: "The support of paupers and the giving of assistance to those who, by reason of age, infirmity, or disability, are likely to become such, is, by the practice and common consent of civilized countries, a public purpose. The laws not only exempt from taxation the limited means of such persons, but they go further and provide public funds with which to furnish them retreats where they can be supplied with the necessaries, and, to a reasonable extent, with the comforts of life. Hospitals are also provided where dependent classes can receive medical aid and assistance, and asylums where the deaf, the dumb, and the blind may be supported and taught, and where the insane may be kept from doing or receiving harm, and can have such careful and scientific treatment, with a view to their restoration, as they would not be likely to receive elsewhere. He would be a bold man who, in these days, should question the public right to make provisions for these benevolent objects. And this provision might not only be made by the establishment of institutions for the purpose, but private institutions might undoubtedly be aided with public funds, in consideration of services to be rendered to the public, and expenses to be incurred by them in assisting and relieving the same necessitous and dependent classes." Cooley on Taxation, pp. 204-5.

Under the specific enumeration of powers conferred by statute upon municipal corporations contained in § 7529 of Crawford & Moses' Digest, the power to construct and maintain city hospitals is not mentioned, yet this court, in the recent case of *Cumnock* v. *Little Rock*, 154 Ark. 471, held that municipal corpor-

ations had such power, under the general welfare
clause, to preserve the health and promote the comfort
and convenience of the inhabitants of the city. If the
building of a city hospital is within the implied powers
granted to municipal corporations under the general
welfare clause to preserve the health of the inhabitants
of the city, then surely the benevolent purposes which
the welfare association was organized to perform, and
is performing, in the city of Fort Smith come also well
within the compass of these powers. For there are no
more worthy or higher objects of government to be at-
tained than those of making suitable provision for the
care and maintenance of those of the city's inhabitants
who, through unavoidable casualty and misfortune,
have become indigent and sick, and who are therefore
wholly unable to care for themselves. This includes not
only the aged and infirm, but orphans, or babies and
poor dependent children whose parents are unable to
care for them. In short, it would be difficult to imagine
or state a more deserving public purpose or one coming
more within the compass of the true functions of muni-
cipal government, than the benevolent objects set forth
in the answer and shown by the proof in this record
which the welfare association has sponsored and is
successfully performing for the inhabitants of the city
of Fort Smith.

The question then recurs, is there anything in the
above provisions of the Constitution prohibiting the city
government of the city of Fort Smith from passing an
ordinance appropriating money out of the general funds
in its treasury to aid the welfare association in carry-
ing out the laudable work which it is doing? In *Jones-
boro* v. *Montague,* 143 Ark. 13, we said: "When the
powers to be performed by the governing body of muni-
cipal corporations are of a ministerial, administrative,
or executive nature, they may delegate the power to a
committee. The business of municipal corporations, like
other corporations, must be conducted through agents.

To segregate a municipal corporation from all other corporations in the methods employed in the transaction of business would prove highly detrimental to all concerned, and if it could not act upon any matter properly before it which also affected the rights of its officers, few competent persons could be induced to accept such offices.'' That principle applies here. In contributing of its funds to this welfare association or committee to carry on governmental work which otherwise the city would have to perform, or at least should perform through some other agency, it in effect but adopts this welfare association as its own agency to do the character of governmental work which manifestly the city authorities conceived could be better, or at least as well, done as through some instrumentality which was exclusively of its own creation and over which it had supreme control.

It will be observed that the Welfare Association had in its membership a majority of the commissioners charged with the city government of the city of Fort Smith. Thus the city, through its officers as members of the welfare association, does have a large voice in the distribution of the fund contributed by it to the benevolences mentioned. It occurs to us that the fact that private individuals and civic clubs and organizations also contributed to a fund which is used to accomplish the same objects does not make the contribution by the city any the less a contribution toward the legitimate purpose of promoting the general welfare of its inhabitants, and thus performing a governmental function.

Any one at all familiar with the history of the times and the conditions and environment of our State Government when the Constitution of 1874 was framed will know that the wise men who laid the various provisions of our organic law, among them the section above quoted, did not have in mind the prevention of municipal aid to committees, or other *quasi*-municipal governmental agencies to carry out the purposes of municipal govern-

ment. The Constitution of 1874 was framed in convention as the organic law of the State of Arkansas by representatives chosen by the people just after they had been disenthralled from a government which had been foisted upon them by acts of Congress during the period known as the Reconstruction Era, and which government, out of popular derision and contempt for those then in authority, was designated as "the carpetbag government," because it was dominated for the most part by foreign political adventurers and freebooters who came among us for no other purpose than to exploit the resources of our people for their private gain. During this period the people of the State at large and of many of the counties and municipalities were burdened with oppressive exactions of taxation laid for the purpose of paying bond issues and guarantees of bond issues, of public and *quasi*-public corporations, granted ostensibly in aid of railroad and levee building and other such projects, but which projects in reality were never consummated, and from which the people themselves received no benefit whatever. In other words, there was a saturnalia of bond issues given to companies, associations, corporations, institutions, and individuals, which were conceived, planned, and carried out by those then having the reins of government, not for the public good, but for the private loot and enrichment of those in governmental control. Section 5, article 12, of the Constitution, *supra,* was intended to forever forestall and prohibit a recurrence of such conditions. It was with this in view that municipal corporations were prohibited from appropriating money or lending their credit to corporations, associations, institutions, or individuals who were either organized for or engaged in purely private enterprises, or who, if organized for or engaged in a public enterprise, or *quasi*-public enterprise, might exploit or use the public funds or resources of the State's governmental agencies for private gain. It was never the design of the builders of the framework

of our government to prohibit municipalities from carrying on governmental functions of the character indicated in this record through any agency which they might select for those purposes. It must be remembered that the intent of the framers of the Constitution, gathered from both the letter and spirit of the instrument, construed in the light of the history of events which gave it birth, is the law. *Martin* v. *State,* 60 Ark. 343-348.

As we have shown, the welfare association does not come within the letter of the constitutional inhibition, nor does it come within its spirit. Following the trend of thought expressed by Judge COOLEY, *supra,* and the doctrine in harmony therewith declared in *Cumnock* .v. *Little Rock, supra,* we now hold that the work of the welfare association, as set forth in this record, was well within the sphere of the municipal government of the city of Fort Smith, and that section 5, article 12, *supra,* of the Constitution, should be construed as if such governmental purposes were expressly authorized by it. An illuminating authority in support of the conclusion thus arrived at is that of *Shepherd's Fold* v. *Mayor, etc., of New York,* 96 N. Y. 137. See also *Wisconsin Industrial School for Girls* v. *Clark County,* 103 Wis. 657-669; *McLean County* v. *Humphreys,* 104 Ill. 387, where it is declared, "it is the unquestioned right and imperative duty of every enlightened government, in its character of *parens patriae,* to protect and provide for the comfort and wellbeing of such of its citizens as, by reason of infancy, defective understanding, or other misfortune or infirmity, are unable to take care of themselves. The performance of this duty is justly regarded as one of the most important of governmental functions, and all constitutional limitations must be so understood and construed as not to interfere with its proper and legitimate exercise," the above doctrine. A majority of us unqualifiedly approve.

It is argued in the brief of counsel for the appellants that, inasmuch as statutes of the State which apply to the area over which the city of Fort Smith has jurisdiction, and the general statutes of the State, adequately provide ways and means for doing the work of the welfare association other than through the instrumentality of such welfare association, therefore the ordinance under review is invalid because it undertakes to do or to aid in doing the same work through the agency of such association or committee. This argument is manifestly unsound. Because the county, as a governmental agency, may do a part of the same work under general statutes, or the city may do all, or a part of the same work in other or different ways, or through different agencies, is no reason why the city may not adopt the welfare association as the most economical and efficient instrumentality that could be adopted for accomplishing the purposes of municipal government as set forth in this record and authorized by the general welfare clause (§ 7494, C. & M. Digest) of our statute relating to municipalities. These powers and instrumentalities are not in conflict, but are concurrent and auxiliary. See, by analogy, *Brizzolara* v. *State,* 37 Ark. 369; *DeWitt* v. *La-Cotts,* 76 Ark. 250; *Brooke* v. *State,* 86 Ark. 364.

It follows that the decree of the chancery court of Sebastian County is in all things correct, and the same is therefore affirmed.

HART, J., (dissenting). The Chief Justice and myself are of the opinion that the ordinance appropriating money to the Fort Smith Federated Welfare Association violates art. 12, § 5, of the Constitution of 1874, which reads as follows: "No county, city, town or other municipality corporation shall become a stockholder in any company, association or corporation, or obtain or appropriate money for, or loan its credit to, any corporation, association, institution or individual."

It will be noted that this provision of the Constitution prohibits municipal corporations from appropri-

ating money for or loaning its credit to any corporation, association, institution or individual. Hence the first question to be considered is whether the Fort Smith Federated Welfare Association is an association within the meaning of the Constitution.

It is true the association is devoted to charitable purposes, but it is nevertheless a voluntary association, and is not under the legal control of the city. While the mayor was elected a member of the board of directors, this was done by the voluntary action of the members of the association, and he was not elected pursuant to any law requiring it, nor did he become a director by virtue of his office as mayor. Neither the city nor the State has any control whatever over the association or management of its affairs. The institution owes no duty to the city or to the State. The question is whether the association comes within the prohibition of the Constitution. The same principle would apply as in cases of public and private corporations. Under this provision of the Constitution a municipal tax must be for a public and not a private purpose. Under it, the Legislature has no power to authorize a municipal corporation to make a gift of money raised by taxation to a voluntary association of individuals or an institution organized to carry on private charity, although it may result in incidentally benefiting the public. See *Dartmouth College v. Woodward,* 4 Wheat. (U. S.) 518.

The ordinance under consideration by its terms made a donation for the support and maintenance of the Fort Smith Federated Association, and, by the terms of the section of the Constitution above quoted, such donation was prohibited. This provision of the Constitution is self-executing, and required no legislation to place it in full force and effect.

In considering a similar question under a similar clause of the Constitution of the State of Illinois, in the case of *Washington Home of Chicago v. City of Chicago,* 29 L. R. A. 798, the Supreme Court of that

State held that a corporation composed of private individuals, not restrained by law from conducting its business for private benefit, which does not report to and is not inspected by any State official, elects its own managers without the State's approval, and by law owes the State no duty, is a private corporation within the provisions of the Illinois Constitution prohibiting municipalities from making donations to private corporations.

In the article on Municipal Corporations in Ruling Case Law, it is said that the power of a municipal corporation under legislative authority to expend funds raised by taxation upon public institutions, such as hospitals, schools and similar undertakings which are owned, operated and controlled by the municipality, is unquestioned. Continuing his discussion of the subject the author said: "It is not, however, within the power of a municipal corporation, even with express legislative authority, to donate funds in aid of a private institution, although it is devoted to a charitable educational work for which public funds might lawfully be expended by the municipality directly if the corporation controls the institution, selects its own officers, manages its own affairs and owes no duty to the State except that which arises from the nature of the work undertaken by it. The incidental benefit to a city of town from the location of such an institution within its limits is not the kind of benefit and interest which will authorize a resort to the power of taxation." 19 R. C. L., sec. 25, pp. 716-717. Several cases in addition to the one above mentioned are cited in support of the text. Among others is the case of *Egan* v. *City and County of San Francisco,* 165 Cal. 576, 133 Pac. 294, Ann. Cas. 1915-A, 754. In that case the Supreme court of California held that, even if it should be granted that the municipality had the right, under its charter, to own and conduct an opera house, it did not have the power, after acquiring the ownership of such structure located on the land belonging to the municipality, to turn over to a body of pri-

vate citizens the absolute control and management of the property. The court said that the public use of public property could not coexist with the private management and control of such property.

The same reasoning applies here. If the management of a hospital or other like building owned by the city could not be turned over to the control and management of some private agency, the city could not donate the public funds to aid a private association, although its activities are devoted to charity and are beneficial to the public.

We think this principle was distinctly recognized in the case of *Shepherd's Fold* v. *Mayor, etc. of N. Y.*, 96 N. Y. 137, relied upon to sustain the majority opinion. In that case the court was construing secs. 10 and 11 of an amendment to the Constitution adopted by vote of the people in November, 1874. So much of the sections as are applicable are as follows:

"Sec. 10.   Neither the credit nor the money of the State shall be given or loaned to or in aid of any association, corporation or private undertaking. This section shall not, however, prevent the Legislature from making such provision for the education and support of the blind, the deaf and dumb, and juvenile delinquents, as to it may seem proper. Nor shall it apply to any fund or property now held, or which may hereafter be held, by the State for educational purposes.

"Sec. 11.   No county, city, town or village shall hereafter give any money or property, or loan its money or credit to or in aid of any individual, association or corporation, or become directly or indirectly the owner of stock in, or bonds of, any association or corporation; nor shall any such county, city, town or village be allowed to incur any indebtedness except for county, city, town or village purposes. This section shall not prevent such county, city, town or village from making such provision for the aid and support of its poor as may be authorized by law."

The court in construing them said: "The general scheme of the constitutional provisions referred to seems to be that the general funds of the State shall not be given to local charitable institutions, except in aid of the blind, the deaf and dumb, and juvenile delinquents, and that the poor are to be provided for in their localities, counties, cities, towns and villages, being allowed to make any provision for the support of their poor which may be authorized by law. Carrying out the designated charities through the instrumentality of private corporations is not prohibited by the Constitution, but the giving away of the money either of the State or of its counties or other local divisions to individuals or private corporations, except for the designated purposes for which each is authorized to provide, is forbidden."

In addition there was a statute empowering the commissioners of charities to transfer orphans and friendless children to the charge of the Shepherd's Fold. There was also a statute authorizing the board of supervisors of the county of New York to levy and collect a tax and pay the same over to the Shepherd's Fold, to be applied to the purposes and objects of the said corporation. The court said that, having the authority, under the Constitution, to commit to the charge of the Shepherd's Fold the specified class of the poor, it was a matter of legislative discretion to determine how the expenses of these children should be provided for. So, too, we think *McLean County* v. *Humphreys,* 104 Ill. 378, relied upon by the majority opinion, supports our view. In that case there was a statute making it the duty of the county court to commit infant females of a designated class to the industrial school, and charging the county with the expense of their maintenance. Hence the question of the power of a county or municipality to donate to a private charity was not involved. The case of *Wisconsin Industrial School for Girls* v. *Clark County,* 103 Wis. 651, sustained the constitutionality of a statute providing for the commitment of infants of a certain

class to industrial schools, and charges the counties from which the commitments are made with the expense thereof.

In all these cases the courts recognized that a simple gift of the money to the institutions would have come within the constitutional prohibition, whether the money was regarded as State, city, or county money.

In construing the provision of the Constitution under consideration, this court has held that a municipal corporation cannot assist in the building of a courthouse for the county to be located within its limits. *Russell* v. *Tate*, 52 Ark. 541. Neither do we think that the case of *Cumnock* v. *Little Rock*, 154 Ark. 471, lends any support to the majority opinion. In that case it was said that municipal corporations have only the powers expressly conferred by statute, and such as are necessarily incident to those expressly granted, or essential to the declared objects and purposes of the corporation. Hence we held that, under the section of the statute relating to municipal corporations commonly known as the general welfare clause, the common council of the city had the power to provide by ordinance for the erection and maintenance of a public hospital by said city. This statutory provision, in our opinion, has no reference to or connection with private charitable hospitals which have been erected or established in a city by any private corporation, society, or voluntary association.

It is conceded that there is no express power in the statute conferred upon a city to make donations or gifts gratuities to private hospitals, and it is equally clear to our minds that no such power is essential to the existence and wellbeing of a city. If once the principle is adopted that a city may raise money by taxation for private purposes, or bestow money raised by taxation gratuitously, it will inevitably follow that municipal corporations might by insensible degrees increase their donations to various charitable objects until all the

people of the city must bend their backs to the burden of taxation, to such an extent that poor people, or those of moderate means, may become themselves in danger of being paupers. While the charity under consideration in this case is a wise and beneficent one, we do not think that the ordinance under consideration can be regarded as the proper exercise or application of the implied police powers of the city.

Our view on this branch of the case is well expressed in *St. Mary's Industrial School* v. *Brown*, 45 Md. 310. In that case the court said: "We have carefully examined all the statutes to which we have been referred, and all others in any manner relating to the subjects under consideration, and we have utterly failed to discover any express power, or any by fair implication, by which the appropriations to the appellants, in the manner in which they have been made, can be sustained. They are made without terms or conditions. The institutions could receive the money thus appropriated, and the day after, in the exercise of the powers completely in their control, discharge every inmate received from the city. We speak not of what would likely be done, but of the power to do. The city council, in making these appropriations, entirely abdicate all discretion over the subject of their application. They become therefore mere donations. Who shall or who shall not be the objects of the charity, the city retains no power to determine. Whether the inmates really belong to the pauper class,—whether they be really objects of municipal care and protection—are questions that the city authorities do not determine, and have no means of determining. It is all left to the discretion of those who manage the institutions, and they, as we have shown, are not municipal agents, nor subject to any control or accountability as to the use and application of the money. It is certain, we suppose, that the city council could have no power to make appropriations to these institutions simply as such, nor because merely of the very humane and laudable objects and purposes

for which they were created by their founders and promoters; it is only because of the actual services and benefits rendered the city that any claim could be urged for their support from the city treasury. And, if this is so, what guarantee has the city that services or benefits will accrue, commensurate with the appropriations that are made? The same principle that would sustain these appropriations would equally sustain appropriations to every private school and private charity in the city. And once concede the power to make them, and it will be in vain to invoke the courts to exercise a discretion as to any limit in the amount or extent of them.

"That the city has ample power delegated to it, and that it is a duty, to provide for the foundlings, the insane, the indigent, infirm and helpless, and for the correction of the vicious and vagrant portions of its population, is beyond all question; but whatever provisions may be made must be under the control and subject to the supervision of municipal authority." See also *Hitchcock* v. *St. Louis,* 49 Mo. 484.

Municipal corporations hold their money for their inhabitants to be expended for legitimate corporate purposes. The right of taxation by such corporations extends only to raising money for public purposes and uses. There is no definition of a public purpose or use which can include the maintenance and support of a private charitable institution by the donation of money levied and collected by taxation. It is one thing for a city to provide itself with a hospital or the like institution to care for the poor and the sick, and quite another to make gifts to a private institution for that purpose. The former is a public purpose, and is not prohibited by the Constitution; the latter is a private purpose, and falls within the ban of the clause of the Constitution of 1874 quoted above.

The Fort Smith Federated Welfare Association is a private institution not under the control of the city and having no legal connection with it. It will exist only

during the pleasure and for the purpose of its members. If the money collected by taxes may be given to it, it may also be donated to any other private corporation or person.

Therefore we respectfully dissent.