The Honorable Brent Davis Prosecuting Attorney, Second Judicial District P.O. Box 491 Jonesboro, AR 72403
Dear Mr. Davis:
I am writing in response to your request for my opinion regarding the provisions of A.C.A. § 23-111-509(e)(2)(c). You inform me that the city of West Memphis and Crittenden County, Arkansas, pursuant to this statute, are currently each receiving ½ the value of unredeemed winning pari-mutuel tickets from Southland Racing Corporation. You have specifically requested my opinion on the following questions:
 (1) Does paragraph (e)(2)(c) of the statute addressing the organizations and entities that should receive the city funds have any bearing on how the County should distribute the funds it receives or is it limited in application to the city?
 (2) Is this statute constitutional in light of article 12, § 5 of the Arkansas Constitution, which states:" No county, city, town or other municipal [corporation] shall . . . appropriate money for, or loan its credit to, any corporation, association, institution or individual"?
 (3) Is Crittenden County allowed to distribute any of its share of such funds for charitable purposes, in view of the prohibition of Article 12, § 5 of the Arkansas Constitution?
RESPONSE
In my opinion, the answer to your first question is no; the answer to your second question is no; and the answer to your third question is probably, so long as the charitable purpose serves a governmental purpose and so long as the recipient is not a private nonprofit corporation.
DISCUSSION
Section 23-111-509(e)(2) of the Arkansas Code Annotated provides:
 (A) However, all winning pari-mutuel tickets not presented to the franchise holder for redemption on or before the one hundred eightieth day next following the last racing day of each racing meet hereafter held shall be void.
 (B) Of the moneys represented by the void pari-mutuel tickets, the franchise holder shall immediately distribute the proceeds as follows:
 (i) One-half (1/2) of the amount thereof shall be paid to the treasurer of the county in which the racing track is located for credit to the general fund of the county; and
 (ii) One-half (1/2) of the amount thereof shall be paid to the treasurer of the city in which the racing track is located and shall be credited to the general fund of the city.
 (C) The money shall be used for charitable purposes only, benefiting young females and young males of the city as determined by the mayor and the governing body of the city. It is the intent that the funds shall be made available to and used by the Girls' Club and Boys' Club or similar nonprofit charitable organizations providing recreational youth services benefiting young females and young males of the city.
(Emphasis added.) I have reproduced this section in full to provide some context for your specific questions, which all relate to the effects of the highlighted subsection (C).
QUESTION 1: Does paragraph (e)(2)(c) of the statute addressing theorganizations and entities that should receive the city funds have anybearing on how the County should distribute the funds it receives or isit limited in application to the city?
When considered in the entire context of subsection (e)(2), paragraph (e)(2)(C) might best be described as muddled — a fact that I assume occasioned your first question. Paragraph (e)(2)(B) clearly dictates an equal division between the county and the city of the proceeds realized from void winning tickets. Paragraph (e)(2)(C) then begins by declaring that "[t]he money shall be used for charitable purposes only. . . ." — a clause that one would naturally assume referred to "the moneys" whose division between the county and the city was prescribed in the previous paragraph. However, this assumption would be wrong, since the remainder of the sentence identifies the beneficiaries of this charity as being only the "young females and males of the city as determined by the mayor and the governing body of the city." (Emphasis added.) The remaining sentence of the paragraph likewise provides only for "recreational youth services benefiting young females and young males of the city." (Emphasis added.) There is simply no mention in this paragraph of the county or its residents.
It is my duty to construe this or any statute just as it reads, "giving the words their ordinary and usually accepted meaning in common language." Brimer v. Arkansas Contractors Licensing Bd., 312 Ark. 401,405, 849 S.W.2d 948 (1993). On its face, paragraph (e)(2)(C) refers only to "the city." It would further be illogical in the extreme to conclude that the "money" referred to in this paragraph could comprise the "moneys" whose division is described in paragraph (e)(2)(B), since this interpretation would lead to the absurd result that the city alone would always realize the full benefit of money awarded to the county. A court will reconcile different statutory provisions to make them consistent, harmonious and sensible; and it will decline an interpretation that results in absurdity or injustice, leads to contradictions or defeats the plain purpose of the law. Ragland v. Allen Transformer Co., 293 Ark. 601,740 S.W.2d 133 (1987). As the Supreme Court recently observed in Bush v.State, 338 Ark. ___, ___ S.W.2d ___ (October 14, 1999): "It is axiomatic that the meaning of certain words or phrases cannot be determined in isolation, but must be drawn from the context in which they are used." In my opinion, considering the recited statute as a whole, the "money" referred to in paragraph (e)(2)(C) can only be the ½ amount of winning void tickets prescribed for the city in paragraph (e)(2)(B). It follows that paragraph (e)(2)(C) is limited in its application to the city and has no bearing on how the county distributes its funds.
QUESTION 2: Is this statute constitutional in light of Article 12,Section 5 of the Arkansas Constitution, which states: "No county, city,town or other municipal [corporation] shall . . . appropriate money for,or loan its credit to, any corporation, association, institution orindividual"?
My response to your question must be guided by the following principles. As the Supreme Court noted in McCutchen v. Huckabee, 328 Ark. 202, 207,943 S.W.2d 225 (1997): "It is well settled that acts of the General Assembly are presumed to be constitutional and will be struck down only where there is clear incompatibility between the act and the state constitution. Stratton v. Priest, 326 Ark. 469, 932 S.W.2d 321 (1996);Fayetteville Sch. Dist. No. 1 v. Arkansas State Bd. of Educ.,313 Ark. 1, 852 S.W.2d 122 (1993)." In accordance with this presumption, if it is possible to construe an act so that it will meet the test of constitutionality, a court not only may but should and will do so. Lovev. Hill, 297 Ark. 96, 759 S.W.2d 550 (1988).
Paragraph (e)(2)(C) dictates that the funds collected by the city be used as follows: "It is the intent that the funds shall be made available to and used by the Girls' Club and Boys' Club or similar nonprofitcharitable organizations providing recreational youth services benefiting young females and young males of the city." (Emphasis added.) For purposes of my analysis, I am assuming that the referenced highlighted institutions are private, nonprofit charitable corporations. In my opinion, this statute is constitutionally suspect. To explain why, some historical review is warranted.[1]
Because of its broad proscription against grants or loans "to any corporation, association, institution or individual," art. 12, § 5 would appear to bar any and all such appropriations to any entity or person regardless of how exalted the purpose. However, the case law has somewhat complicated this issue. In Bourland v. Pollock, 157 Ark. 538, 545,249 S.W. 60 (1923), the Court ruled that a confederation of private organizations and public officials, the Fort Smith Federated Welfare Association, whose purpose it was to aid "sick and afflicted children, wayward girls and worthy or indigent families," was not constitutionally prohibited by art. 12, § 5 from receiving public funds. In support of this conclusion, the Court remarked that the Welfare Association fulfilled a "public purpose" that the city of Fort Smith would otherwise have had to fulfill through the "governmental work" of its own agencies. Id. at 546. Understandably, in my opinion, the dissent protested that even a voluntary association engaged in charitable work nevertheless remained an "association" subject to the art. 12, § 5 proscription, particularly in light of the fact that it was not "under the legal control of the city."[2] 157 Ark. at 550.
In Bank of Commerce v. Huddleston, 172 Ark. 999, 1003-04, 291 S.W. 422
(1927), Chief Justice Hart (who wrote the dissent in Bourland) offered the following analysis in the course of reversing a successful art. 12, § 5 challenge to the city of McGehee's issuance of warrants to support a citywide improvement district:
 Under this section of our Constitution, public money or the public revenue cannot be used or pledged in aid of private enterprises. In no case originated by individuals, whether associated or not, or by private corporations with a view to gain, can municipal corporations participate in such manner as to incur pecuniary expense or liability. Municipal corporations may not become stockholders or furnish money or credit for the benefit of private enterprises. The object of the provision in the Constitution was to prevent municipal corporations from engaging in enterprises foreign to the purpose for which they were organized and assuming liabilities not within the compass of the usual and necessary powers of cities and towns. The question of the power of municipal corporations to subscribe for or to loan its credit in the form of bonds in aid of railroad companies had been the subject of much litigation in other States, and the framers of the Constitution enacted the section in question for the purpose of settling the question. Russell v. Tate, 52 Ark. 541, 13 S.W. 130; Newport v. Railway Co., 58 Ark. 270, 24 S.W. 427; and Luxora v. J.L.C. E. Rd. Co., 83 Ark. 275, 103 S.W. 605.
What is striking about this passage is that it appears somewhat to qualify the proscription against assistance even to "private enterprises" by adding "with a view to gain." In any event, immediately after offering its analysis, the Court concluded that a citywide improvement district does not fall within the constitutional proscription. Id. at 1004.[3]
In Neel v. City of Little Rock, 204 Ark. 568, 568-69, 163 S.W. 2d 525
(1942), the Court ignored an art. 12, § 5 objection to the city's contributing $5,000 to the Community Chest for the purposes of helping fund numerous city welfare organizations. The Court cryptically remarked that it need not address the constitutional arguments at issue inBourland because a statute authorized the donation. The Court noted in passing that the city had sufficient excess funds to make the contribution. 204 Ark. at 568. I find this decision frankly baffling, since a meritorious constitutional objection would obviously have rendered moot any debate about whether the donations were justified by statute. In the companion case of City of Little Rock v. CommunityChest, 207 Ark. 562, 566-67, 163 S.W.2d 522 (1942), the Court likewise ignored the constitutional argument raised in Bourland, reversing a decision upholding the city waterworks' pledge to the Community Chest because (a) the language of the applicable bond issue did not support making such a pledge; and (b) the statute authorizing such a pledge, which would have become part of the contract, was not yet in effect at the time the pledge was made.
In 1943, the Court further announced that art. 12, § 5 did not bar the contribution of municipal funds to a street improvement district. City ofParis v. Street Improvement District No. 12, 206 Ark. 926, 175 S.W.2d 199
(1943).
As of 1943, then, the Court appeared to have taken the position that municipal contributions to various sorts of public and quasi-public entities would pass constitutional muster, provided that the contribution served a "public purpose" or effected a "governmental function" and particularly if either the recipient's existence or the donation itself was authorized by statute. See also Hogue v. Housing Authority of NorthLittle Rock, 201 Ark. 263, 144 S.W.2d 49 (1940) (approving statutorily authorized donation to housing authority because it served a public purpose). Moreover, as reflected in Neel and Community Chest, these attitudes seemed so ingrained in the Court that a party raising a constitutional objection risked being totally ignored.
However, in Halbert v. Helena-West Helena Industrial Development Corp.,226 Ark. 620, 625, 291 S.W.2d 802 (1956), the Court adopted what seems a much stricter interpretation of art. 12, § 5, offering the following analysis of the statutorily authorized purchase by a local government of a "membership" in a local industrial development corporation:
 Under Section 20 of the Act 404, a city, town or county is allowed to "purchase membership" in a local industrial development corporation. It would be doing indirectly what the Constitution forbids to be done directly, if a county or municipality were allowed to purchase a membership in the corporation, because such purchase of "membership" would certainly be granting financial aid to the said local corporation. When the Arkansas Legislature allowed the creation of local development corporations as private non-profit corporations, it could not at the same time allow counties or municipalities to grant financial aid to such corporations.
Halbert thus establishes beyond all question that a municipality cannot contribute to a private, nonprofit corporation regardless of whether the corporation serves a "public purpose." In accordance with this conclusion, the Court struck the constitutionally offensive portion of the Arkansas Industrial Development Act, although it allowed the remainder of the Act to stand. Id. at 625-26.
In reaching its conclusion, the Court distinguished Neel in a manner that verges on overruling the case outright:
 The appellees cite the case of Neel v. City of Little Rock, 204 Ark. 568, 163 S.W.2d 525, 142 A.L.R. 1071, as a case in which we allowed a city to donate money to the Community Chest and say that, by the same token, we should allow cities to buy memberships in local development corporations organized under Act 404. But in Neel v. City of Little Rock, some surplus money of a city was allowed to be given to public charity, which saved the city from making certain expenditures; that is far different from the situation here. At all events, Neel v. City of Little Rock is a borderline case; and we refuse to extend the effect of its holding.
The apparent sea change in the Court's approach to art. 12, § 5 challenges was again illustrated in City of Little Rock v. Venhaus,302 Ark. 204, 788 S.W.2d 478 (1990), which involved the question of how to distribute the residuals remaining from an illegal exaction after the chancellor had distributed proceeds from the common fund to identified taxpayers. The chancellor distributed $700,000 to various charities, including $355,000 to nonprofit corporations, and directed that the remaining $3.3 million be devoted to building a juvenile justice center. The Supreme Court reversed both awards, noting that "[s]uch use of public funds is arbitrary and capricious, necessarily leads to unpredictable results, and is impermissible." Id. at 211. Invoking Halbert, the Court recited the constitutional ban on giving county or municipal funds "to any corporation, association, institution, or individual" and directed that "the residual funds be returned pro rata to the governmental entities to be used for general municipal services." Id. (emphasis added). What is perhaps most striking in this decision is that the Court did not even undertake an analysis of whether any portion of the award was devoted to a "public purpose" or might be characterized as fulfilling a "governmental function." Rather, the Court simply ruled that the funds be returned to the appellant municipalities "to be used for general municipal services" — a directive that verges on a pronouncement that only the city, county or an agency thereof can properly expend such funds.
Finally, in McCutchen v. Huckabee, 328 Ark. 202, 943 S.W.2d 225 (1997), the Supreme Court entertained an article 12, § 5 challenge to legislation that had appropriated $20 million for a multipurpose civic center in Pulaski County. The quorum court enacted an ordinance creating a Multi-Purpose Civic Center Facility Board to oversee construction and eventually take ownership of the facility. The appellants objected to the use of public funds for this purpose. Invoking City of Paris, which had rejected a similar challenge to public funding of an improvement district, the Court concluded that "facilities boards are not the type of company, association, or corporation contemplated by Article 12, Section 5." 382 Ark. at 213. Consequently, notwithstanding the judicial tightening of the rule restricting the use of public funds, there apparently remains a category of quasi-public entity that can properly be awarded such funds.
Specifically addressing your second request, in light of the foregoing authorities, it is my opinion that any statutory provision to give charitable funds to "the Girls' Club and Boys' Club or similar nonprofit charitable organizations providing recreational youth services" is unconstitutional. In my opinion, such organizations clearly fall within the contemplation of article 12, § 5, particularly if they are, as I assume, private nonprofit corporations. If the Supreme Court were faced with a constitutional challenge to this provision, I predict it would follow the approach it took in Halbert, 226 Ark. at 625-26, striking the unconstitutional provision but allowing the rest of the legislation to stand, including the provision that revenues realized from the void winning tickets be divided evenly between the city and the county.
Question 3: Is Crittenden County allowed to distribute any of its shareof such funds for charitable purposes, in view of the prohibition ofArticle 12, § 5 of the Arkansas Constitution?
As reflected in the foregoing discussion, any use of county moneys for charitable purposes may well pass constitutional muster if the use serves a public purpose or achieves a governmental function, so long as the recipient can be characterized as "public" in the sense discussed above. As the law currently stands, there appears to be some element of fiat in the Supreme Court's pronouncements regarding what pledges of municipal or county funds will be permitted. As established in McCutchen, it is clearly permissible, for instance, to contribute to a facilities board, which, despite not being a straightforward municipal agency, has a statutory pedigree and has been identified as a category of entity beyond the contemplation of article 12, § 5. In the wake of Venhaus, however, it is clearly impermissible to contribute to a private nonprofit corporation like the AIDC. Perhaps the most that can be said is that if an entity is authorized by statute and is not organized as a private nonprofit corporation, and especially if the donations themselves are authorized by statute, a donation of county or municipal funds may be constitutional. These principles reflect a clear move by the Court to reassert that public moneys may only be put to public use. The analysis of whether a particular entity meets these criteria is one of fact, which I lack the information and authority to undertake.
As reflected in my response to your second request, assuming the organizations recited in A.C.A. § 23-111-509(e)(2)(C) are private, nonprofit corporations, I do not believe they could constitutionally receive charitable funds from the county. However, you should be aware that nothing in the constitution precludes the county from contracting with a private nonprofit charity, so long as the contract is supported by adequate consideration and serves a proper governmental end. Cities and counties clearly can enter into contracts that are supported by valid consideration. See Ops. Att'y Gen. No. 98-025 and 97-250; A.C.A. §14-54-101(2); City of Ft. Smith v. Bates, 260 Ark. 777, 544 S.W.2d 525
(1976); City of Harrison v. Boone County, 238 Ark. 113, 378 S.W.2d 665
(1964). Moreover, this authority includes the power to contract with nonprofit organizations. See Woodruff v. Shockey, 297 Ark. 595,764 S.W.2d 431 (1989). Such contracts have been upheld as not being in violation of Article 12, § 5. See Arkansas Uniform Linen Supply v.Institutional Services Corp., 287 Ark. 370, 700 S.W.2d 358 (1985). To the extent, then, that the provision of recreational services for young people is an appropriate governmental function, the county might contract for its performance by, say, a Girls' Club or Boys' Club. Again, the decision to undertake such a contract would necessarily be based on factual considerations I am unprepared and unauthorized to review. I advise you to consult with local counsel regarding such matters.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP/JHD:cyh
[1] The ensuing historical analysis is in most but not all respects in accord with that offered in Carpenter, "Buddy, Can You Spare a Dime?:Constitutional Questions about Local Government Donations to Charity," 16 The Arkansas Lawyer (Oct. 1990).
[2] The dissent comprised two of the then five-member Court.
[3] Invoking Huddleston, in Bush v. Martineau, 174 Ark. 214, 223,259 S.W. 9 (1927), the Supreme Court further held that supporting road districts is not repugnant to Ark. Const. art. 12, § 12, which prohibits the state from ever paying "the debt or liability of any county, town, city, or other corporation whatever, or any part thereof. . . ." In that same year, in Ruff v. Womack, 174 Ark. 971, 298 S.W. 222 (1927), the Court ruled that the state's loaning money to needy school districts reflects a "proper purpose" and hence is not prohibited by Ark. Const. art. 16, §1, which provides that "[n]either the State nor any city, county, town or other municipality in this State shall ever lend its credit for any purpose whatever."