The Honorable Danny Ferguson State Representative 212 McCollum Drive Forrest City, AR 72335-2521
Dear Representative Ferguson:
You have presented the following questions for my opinion:
 (1) Under existing law, may a city enter into a long term lease agreement, as lessee, for the sum of One Dollar ($1.00) per year, for property outside the city limits for the purpose of constructing thereon an animal shelter?
 (2) If so, may the city expend public funds to construct a shelter on this property?
You indicate that your questions arise out of a situation involving the City of Forrest City and the Forrest City Area Humane Society, a non-profit corporation organized under the laws of the State of Arkansas, with tax exempt status under Section 501(c)(3) of the Internal Revenue Code. The humane society would own the property in question that is located outside the city limits, and the city would lease part of that property. You do not indicate which of the parties would own the shelter that is to be constructed on the property.
RESPONSE
Question 1 — Under existing law, may a city enter into a long term leaseagreement, as lessee, for the sum of One Dollar ($1.00) per year, forproperty outside the city limits for the purpose of constructing thereonan animal shelter?
Summary of Response
My response to this question must be set forth in separate parts: First, it is my opinion that cities have the authority to lease property outside the city limits for purposes of maintaining an animal shelter. Second, assuming that the lease agreement is an arms' length transaction, the fact that the agreed-upon rate may be below market value does not raise particular legal concerns in a situation where the city is the lessee and is receiving the benefit of that below-market rate. Third, the question of whether the construction of an animal shelter is an appropriate use of public funds will depend upon certain factual questions, as discussed in response to Question 2. All of these matters are discussed more fully below.
1. Property Outside the City Limits
It is my opinion that cities have the authority to lease property outside the city limits under certain factual circumstances, including the circumstances you have described. Under state law, cities are explicitly granted the authority to enter into contracts, and to acquire and hold "real estate, tenements, hereditaments, and such other real and personal property as is necessary and proper for the administration of the affairs of municipal corporations." A.C.A. § 14-54-301. This grant of authority to hold real property is not restricted to property located within the city limits. Rather, it appears to extend to any property that is "necessary and proper" for the administration of municipal affairs. Among the municipal affairs that cities are expressly empowered by state law to administer are the prevention of cruelty to animals, A.C.A. §14-54-103(7), and the protection of the public health, safety, and welfare. A.C.A. § 14-54-103(1) and A.C.A. § 14-55-102. Moreover, the General Assembly has declared that the maintenance of animal shelters is a work that is "necessary to protect the health, safety, and general welfare of the citizenry of this state[.]" A.C.A. § 20-19-101.
The Arkansas Supreme Court has generally adhered to the view that cities have broad discretion to determine what is necessary for the public welfare, safety, comfort, and convenience. See, e.g., Smith v. City ofArkadelphia, 336 Ark. 42, 984 S.W.2d 392 (1999); Sander v. Blytheville,164 Ark. 434, 262 S.W.2d 23 (1924). See also A.C.A. § 14-55-102.
It is my opinion that in light of the express power of cities to prevent cruelty to animals, to protect the public health, safety, and welfare, and to acquire and hold real property as necessary for the administration of municipal affairs, and in light of the General Assembly's declaration of the public welfare nature of the operation of animal shelters, a city would be factually justified in determining that the lease of property outside the city limits is a necessary means of carrying out its express powers to prevent cruelty to animals an to protect the public health, safety, and welfare.[1]
2. The Lease Rate
The fact that the city may have agreed to pay a rate for such a lease that is below market value does not raise any particular concerns under Arkansas law. I note that such a rate could indeed raise concerns if the city were the lessor rather than the lessee, for reasons discussed in response to Question 2. For further discussion of that issue, see Op. Att'y Gen. No. 96-351. However, assuming that the lease agreement is an arms' length, non-fraudulent transaction, the fact that the city is receiving the benefit of a below-market lease rate is not contrary to any principle of law.
3. The City's Contribution to Construction of the Shelter
The question of whether the city may contribute public funds to the construction of an animal shelter on this leased property is addressed in response to Question 2.
Question 2 — If so, may the city expend public funds to construct ashelter on this property?
The question of whether the city may expend public funds to contribute to the construction of an animal shelter (or any other construction) on property that is not owned by the city will depend upon certain factual matters. In particular, the issue will turn primarily upon which entity will own the animal shelter. If the city will own the construction, the contribution would not, in my opinion, give rise to legal concerns as a general matter.[2] However, proper provision must be made in the lease agreement to address the issue of the effect of the expiration of the lease or of any subsequent transfer of the realty upon the city's ownership interest in the construction. More specifically, the lease agreement should include terms to protect the city's ownership interest in the construction and to prevent its reversion to the owner of the realty. If this issue is not addressed, the agreement could be challenged on various constitutional grounds, including Article 12, § 5, and Article16, §§ 11 and 13 of the Arkansas Constitution. See Op. Att'y Gen. No.96-351.
If the private non-profit humane society will own the shelter, the city's contribution to the construction of the shelter will give rise to constitutional concerns under Article 12, § 5 and Article 16, § 13 of the Arkansas Constitution. For purposes of the remainder of the discussion, I will assume that under the circumstances you have described, the city will contribute funds for the construction of the animal shelter, but the humane society will own the construction.
As an initial matter, I must acknowledge the provisions of A.C.A. § 20-19-101, which I mentioned previously. That statute states in full:
 (a) The General Assembly of the State of Arkansas finds and declares that humane societies for the prevention of cruelty to animals, organized under the laws of this state now or hereinafter in effect, are public organizations necessary to protect the health, safety, and general welfare of the citizenry of this state and are discharging a government function.
 (b) The General Assembly of the State of Arkansas finds and declares that the appropriation of public funds for the use of humane societies in the maintenance and operation of shelters for stray, diseased, neglected, and other animals and in the protection of the public from disease among such animals is a public use of the funds in the discharge of a government function.
A.C.A. § 20-19-101.
Although the above-quoted statute purports to authorize the type of expenditure you have described, it does not provide a definitive answer to your question. The real issue is whether an expenditure of this nature (and indeed, whether A.C.A. § 20-19-101 itself) conflicts with the constitutional provisions mentioned above.
Article 12, § 5
Article 12, § 5 of the Arkansas Constitution states:
 5. Political subdivisions not to become stockholders in or lend credit to private corporations.
 No county, city, town or other municipal corporation shall become a stockholder in any company, association or corporation; or obtain or appropriate money for, or loan its credit to, any corporation, association, institution or individual.
Ark. Const., Art. 12, § 5.
A city's expenditure of public funds for the construction of an animal shelter that will belong to a private non-profit corporation might seem, at first blush, to be plainly prohibited by Article 12, § 5. However, a review of the history of the Arkansas Supreme Court's interpretation of Article 12, § 5 indicates that such a conclusion is not necessarily quite so straightforward. My predecessor in this office gave a thorough explication of that history in Op. Att'y Gen. No. 1999-408. I will not reiterate that discussion, but will extract the principles of law that are pertinent to the situation you have described.
In interpreting Article 12, § 5 over the years, the Arkansas Supreme Court has developed several principles that must be considered and harmonized in analyzing any donation of public funds to private entities. These principles do not always lend themselves to facile harmonization, as reflected in the pertinent cases. See, e.g., Bourlandv. Pollock, 157 Ark. 538, 545, 249 S.W. 60 (1923) (confederation of private organizations and public officials whose purpose was to aid "sick and afflicted children, wayward girls and worthy or indigent families" could receive public funds because it served a public purpose that otherwise would have been performed by governmental agencies); Bank ofCommerce v. Huddleston, 172 Ark. 999, 291 S.W. 422 (1927) (donations of public funds to private improvement district was permissible because organization not formed "with a view to gain"); Neel v. City of LittleRock, 204 Ark. 568, 163 S.W.2d 525 (1942) (city contributions to Community Chest that funded various private charities was not objectionable because statutorily authorized); Halbert v. Helena-WestHelena Industrial Development Corp., 226 Ark. 620, 625, 291 S.W.2d 802
(1956) (striking down statutorily-authorized purchase by local government of "membership" in private industrial development corporation, but not reversing Neel); City of Little Rock v. Venhaus, 302 Ark. 204,788 S.W.2d 478 (1990) (reversing distribution of illegal exaction residual funds to various charities, not mentioning "public purpose," and directing that the funds be used for municipal purposes); McCutchen v. Huckabee,328 Ark. 202, 943 S.W.2d 225 (1997) (upholding appropriation to fund a multipurpose civic center to be owned by quasi-public facilities board);Chapman v. Bevilacqua, 344 Ark. 262, 42 S.W.3d 378 (2001) (upholding use of city funds for administration of federal redevelopment program because statutorily-authorized public purpose).
Despite the apparent lack of continuity among the above-cited cases, my predecessor drew the following conclusions regarding the court's interpretation of Article 12, § 5:
 As reflected in the foregoing discussion, any use of county moneys for charitable purposes may well pass constitutional muster if the use serves a public purpose or achieves a governmental function, so long as the recipient can be characterized as "public" in the sense discussed above. As the law currently stands, there appears to be some element of fiat in the Supreme Court's pronouncements regarding what pledges of municipal or county funds will be permitted. As established in McCutchen, it is clearly permissible, for instance, to contribute to a facilities board, which, despite not being a straightforward municipal agency, has a statutory pedigree and has been identified as a category of entity beyond the contemplation of article 12, § 5. In the wake of Venhaus, however, it is clearly impermissible to contribute to a private nonprofit corporation like the AIDC. Perhaps the most that can be said is that if an entity is authorized by statute and is not organized as a private nonprofit corporation, and especially if the donations themselves are authorized by statute, a donation of county or municipal funds may be constitutional. These principles reflect a clear move by the Court to reassert that public moneys may only be put to public use. The analysis of whether a particular entity meets these criteria is one of fact[.]
Op. Att'y Gen. No. 1999-408 at 9.
The expenditure that you have described — i.e., contributions by a city to fund the construction of an animal shelter that will be owned by a non-profit humane society — does not fall squarely within any of the principles enunciated by the court. The fact that the humane society in question is organized as a non-profit corporation would weigh against the permissibility of such contributions by the city under the authority ofVenhaus, supra. On the other hand, the fact that such humane societies have been explicitly declared to be "public organizations necessary to protect the health, safety, and general welfare of the citizenry of this state," see A.C.A. § 20-19-101, and the fact that the General Assembly has explicitly authorized expenditures of public funds to aid such organizations, and has declared such expenditures to be "a public use of the funds in the discharge of a government function," id., would weigh heavily in favor of a conclusion that such expenditures are permissible under the authority of McCutchen, supra.
It is difficult to predict how a court might view such an expenditure, but I tend to believe that if a court were faced with interpreting the expenditure in light of the history of the Supreme Court's application of Article 12, § 5, it would find the expenditure to be more like the expenditure that was approved by the McCutcheon court, and would uphold it as not violative of Article 12, § 5.
Article 16, § 13
Article 16, § 13 of the Arkansas Constitution states:
 Any citizen of any county, city or town may institute suit in behalf of himself and all others interested, to protect the inhabitants thereof against the enforcement of any illegal exactions whatever.
Ark. Const., Art. 16, § 13.
The Arkansas Supreme Court has recognized that an "illegal exaction," within the meaning of Article 16, § 13, can take two forms: (1) A misapplication of public resources; and (2) A wrongful taxation. Williamsv. City of Fayetteville, 348 Ark. 768, 76 S.W.3d 235 (2002); Villines v.Harris, 340 Ark. 319, 11 S.W.3d 516 (2000); Ghegan v. Weiss, 338 Ark. 9,991 S.W.2d 536 (1999); Western Foods, Inc. v. Weiss, 338 Ark. 140,992 S.W.2d 100 (1999); Pledger v. Featherlite Precast Corp., 308 Ark. 124,823 S.W.2d 852, cert. denied, 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46
(1992). A misapplication of public resources involves the use of public resources for a private purpose.
One of the leading cases in which the Arkansas Supreme Court addressed the issue of the unlawful use of public resources for a private purpose was Chandler v. Board of Trustees, 236 Ark. 256, 365 S.W.2d 447 (1963). In that case, a taxpayer challenged the use of tax funds for the purpose of paying retirement benefits to employees of the Arkansas Education Association, which was a private organization. The court concluded that even though these employees worked primarily in jobs that benefited the public, the use of tax funds to pay their retirement benefits did not benefit the public primarily, but rather, primarily benefited the employees privately, and was therefore unlawful. In so holding, the court gave a concise statement of the law applicable to the issue of the use of public funds for a private purpose:
 No principle of constitutional law is more fundamental or more firmly established than the rule that the State cannot, within the limits of due process, appropriate public funds to a private purpose. A century ago the basic doctrine was simply stated in the leading case of Brodhead v. City of Milwaukee, 19 Wis. 624: "The legislature cannot create a public debt, or levy a tax, or authorize a municipal corporation to do so, in order to raise funds for a mere private purpose. It cannot in the form of a tax take the money of the citizens and give it to an individual, the public interest or welfare being in no way connected with the transaction. The objects for which money is raised by taxation must be public, and such as subserve the common interest and well being of the community required to contribute."
Chandler, 236 Ark. at 258, quoting Brodhead v. City of Milwaukee,19 Wis. 624. Accord, Chapman v. Bevilacqua, 344 Ark. 262, 42 S.W.3d 378
(2001); Clark v. State, 308 Ark. 84, 824, S.W.2d 345 (1992) (Brill, J., concurring); Brewer v. Hawkins, 241 Ark. 460, 408 S.W.2d 492 (1966);Samples v. Grady, 207 Ark. 724, 182 S.W.2d 875 (1944).
A primary consideration in "public funds" cases appears to be whether those who contributed the tax money at issue received the intended benefit therefrom, or whether, by contrast, the benefit was received by a private individual or entity. This consideration is largely a question of fact that can only be answered in light of all of the evidence that is relevant to the particular case. I note that a significant factor in making this determination will be the fact that the expenditure in question is statutorily-authorized and declared to be a public government function. See Chapman v. Bevilacqua, 344 Ark. 262, 42 S.W.3d 378 (2001) (upholding against illegal exaction challenge the use of city funds for administration of federal redevelopment program because statutorily-authorized public purpose).
Although I cannot draw any legal conclusions that would require determinations of fact, I do conclude that if a court were faced with the question of whether the expenditure you have described constitutes an illegal exaction under Article 16, § 13, it would be influenced to uphold the expenditure by the fact that the expenditure is statutorily-authorized as a public purpose under A.C.A. § 20-19-101.
Finally, I note that although cities cannot donate funds to private purposes in contravention of the constitution, they are not prohibited from entering into contracts that are supported by adequate consideration and that serve a legitimate public purpose. See Ops. Att'y Gen. Nos.2001-256; 2001-083; 99-357; 97-250; 97-108; 96-287; 95-374; 93-274; 92-099; 91-410; 89-061. A city may, for example, enter into a contract with the humane society under which the humane society performs for the city the city's task of preventing cruelty to animals.
Assistant Attorney General Suzanne Antley prepared the foregoing opinion, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
[1] It should be noted that my conclusion herein that cities may acquire property outside the city limits for purposes of maintaining an animal shelter is not necessarily applicable to all factual and legal circumstances. See, e.g., Op. Att'y Gen. No. 93-173 (opining that a city could not use public funds to construct a fire station outside the city limits).
[2] Of course, the city cannot make such contributions using the proceeds of taxes that were levied for another purpose. See Ark. Const., Art. 16, § 11.